



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------

PHILIP J. GIORDANO,

                        **Plaintiff,**


            -against-

NB EDUCATION, LLC,

                        **Defendant.**

--------------------------------------------------

Civil Action No.


**JURY TRIAL DEMANDED**

COMPLAINT


Plaintiff PHILIP J. GIORDANO, by his attorneys Vedder Price P.C., as and for his

Complaint against defendant NB EDUCATION, LLC, alleges as follows:

## NATURE OF THE CASE

1.      This is an action for breach of contract and declaratory judgment arising from the

defendant employer's breach of a written employment agreement between it and the plaintiff

employee.

## THE PARTIES

2.      Plaintiff Philip J. Giordano ("Giordano") is a citizen of the State of New York

residing in New York County, New York.

3.      Defendant NB Education, LLC ("NBE") is a Delaware limited liability company

with its principal place of business in Hampton, New Hampshire.  Defendant NBE was formerly

known as N B Education, Inc., which was converted from a Delaware corporation to defendant

NBE on or about October 23, 2006.

## JURISDICTION AND VENUE

4.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that the parties are citizens of different States and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

5.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a) in that defendant is subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

6.    On or about February 17, 2006, Giordano and NBE entered into an employment agreement (the "Employment Agreement").  A copy of the Employment Agreement is annexed hereto as Exhibit A.

7.    Pursuant to Section 1(e) of the Employment Agreement, NBE agreed to employ Giordano as its President and Chief Executive Officer for an initial term of three years, beginning on February 17, 2006 and ending on the third anniversary of that date, i.e. February 17, 2009.

8.    Pursuant to Section 1(b) of the Employment Agreement, NBE and Giordano agreed that Giordano's main office would be in New York, New York.

9.    Pursuant to Section 2 of the Employment Agreement, Giordano is entitled to receive, inter alia, annual base salary of not less than $150,000, an annual bonus under certain circumstances, an option to purchase eight per cent (8%) of the total shares of NBE's common stock, health insurance, vacation and other welfare and fringe benefits.

10.    Pursuant to Section 4(c) of the Employment Agreement, if Giordano's employment is terminated during the term of the Employment Agreement without cause, Giordano is entitled to various severance benefits, including but not limited to, payments equal to

-2-

his salary amount, continuation of health insurance coverage, bonus payment, and the vesting of stock options.

11.     Section 15 of the Employment Agreement provides that its provisions shall be construed in accordance with New York law, without regard to the conflict of law provisions of any state.

12.     By letter dated April 30, 2008 sent by NBE to Giordano in New York, New York, NBE purported to terminate Giordano's employment effective immediately upon his receipt of the letter.  A copy of the April 30, 2008 letter is annexed hereto as Exhibit B.  NBE claimed that Giordano's termination was "for cause" pursuant to Section 3(c)(iv) of the Employment Agreement on the alleged ground that he had materially breached the Employment Agreement.

13.     Giordano did not materially breach the Employment Agreement and NBE otherwise failed to satisfy the requirements of the Employment Agreement relating to a termination of employment "for cause."

14.     To the extent that NBE's termination of Giordano's employment is deemed effective, it was without cause.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

15.     Giordano repeats and realleges the allegations set forth above in paragraphs 1-14 of the Complaint as if fully set forth herein.

16.     Although NBE purported to terminate Giordano's employment with "cause," there was, in fact, no cause for termination.

17.     Under the terms of the Employment Agreement, because Giordano's employment was terminated without cause, he is, without limitation, entitled to those payments and benefits set forth in Sections 4(a) and 4(c)(i)-(iv) of the Employment Agreement.

-3-

18.    NBE has breached the Employment Agreement by, without limitation, purporting to terminate Giordano for "cause," and failing and refusing to make those payments and provide those benefits set forth in Sections 4(a) and 4(c)(i)-(iv) of the Employment Agreement.

19.    By reason of the foregoing, Giordano has and/or will be damaged in the amount of at least $195,000, plus interest.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment)**

20.    Giordano repeats and realleges the allegations set forth above in paragraphs 1-19 of the Complaint as if fully set forth herein.

21.    NBE claims that its purported termination of Giordano was "for cause."

22.    In fact, NBE's purported termination of Giordano was without "cause."

23.    The rights and benefits to which Giordano is entitled upon termination differ depending on whether the termination was "for cause" or without "cause."

24.    Pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, there exists a case of actual controversy within this Court's jurisdiction between the parties.

25.    By reason of the foregoing, this Court should issue a declaration declaring that NBE's purported termination of Giordano's employment was made without cause and that Giordano is entitled to all rights and benefits under the Employment Agreement arising upon a termination without cause.

WHEREFORE, plaintiff Philip J. Giordano demands judgment, as follows:

A.    Awarding plaintiff damages in the amount of at least $195,000, plus interest;

NEWYORK/#196443.1

B.    Declaring that any purported termination of plaintiff's employment was without cause and that plaintiff is entitled to all rights and benefits under the Employment Agreement arising upon a termination without cause;

C.    Awarding plaintiff costs, disbursements and reasonable attorneys' fees; and

D.    Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 3, 2008

                                        VEDDER PRICE P.C.

                                        By: _____
                                            Michael G. Davies (MD-6045)
                                            1633 Broadway
                                            47th Floor
                                            New York, New York  10019
                                            (212) 407-7700

                                            Attorneys for Plaintiff
                                            PHILIP J. GIORDANO

**EXHIBIT  A**

Execution Copy

# EMPLOYMENT AGREEMENT

THIS AGREEMENT, made and entered into as of February 17, 2006 (the "Effective Date"), by and between Philip Giordano (the "Executive") and N B Education, Inc. (the "Company").

## WITNESSETH THAT:

WHEREAS, the parties desire to enter into this Agreement pertaining to the employment of the Executive by the Company;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, it is hereby covenanted and agreed by the Executive and the Company as follows:

1. <u>Performance of Services</u>. The Executive's employment with the Company shall be subject to the following:

(a) During the Agreement Term (as defined below), and subject to the terms of this Agreement, the Executive shall be employed by the Company and shall occupy the position of President and Chief Executive Officer of the Company. The Executive agrees to serve in that position or in such other offices or positions with the Company or a Subsidiary (as defined below), as shall, from time to time, be mutually agreed to by the Board of Directors of the Company (the "Board") and the Executive.

(b) During the Agreement Term, while employed by the Company, the Executive shall devote his full time, energies and talents to serving as its President and Chief Executive Officer or such other position determined in accordance with paragraph (a) above. During the Agreement Term, the Executive's main office shall be at the offices of Murphy & Partners, L.P. in New York, NY, or at such other location as shall be mutually agreed to by the Board and the Executive.

(c) The Executive agrees to perform his duties hereunder faithfully and efficiently subject to the directions of the Board. The Executive's duties may include providing services for both the Company and the Subsidiaries, as determined by the Board; provided, that the Executive shall not, without his consent, be assigned tasks that would be inconsistent with those of President and Chief Executive Officer or such other position determined in accordance with paragraph (a) above.

(d) Notwithstanding the foregoing provisions of this paragraph 1, during the Agreement Term, the Executive may devote reasonable time to activities other than those required under this Agreement, including activities involving professional, charitable, community, educational, religious and similar types of organizations, speaking engagements, membership on the boards of directors of

other organizations, and similar types of activities, to the extent that such other activities do not, in the reasonable judgment of the Board, inhibit or prohibit the performance of the Executive's duties under this Agreement, or conflict in any material way with the business of the Company or any Subsidiary.

(e)　The term of the Agreement shall be the period beginning on February 17, 2006 (the "Employment Commencement Date") and ending on the third anniversary of the Employment Commencement Date; subject, however, to earlier termination as provided herein (the "Initial Term"). The Initial Term shall be automatically extended for an additional year at the end of the Initial Term and again each successive year thereafter (each a "Renewal Term"); provided that the Initial Term and any Renewal Term may cease by either party delivering written notice of such cessation to the other party; provided that such notice is delivered at least 90 days prior to the expiration of the applicable Initial or Renewal Term. The Initial Term and the Renewal Term(s) shall be collectively referred to as the "Agreement Term."

(f)　For purposes of this Agreement, the term "Subsidiary" shall mean any corporation, partnership, joint venture or other entity during any period in which at least a fifty percent interest in such entity is owned, directly or indirectly, by the Company (or a successor to the Company).

2.　Compensation.　Subject to the terms of this Agreement, during the Agreement Term, while the Executive is employed by the Company, the Company shall compensate the Executive for his services as follows:

(a)　The Executive shall receive, for each 12-consecutive month period beginning on the Employment Commencement Date and each anniversary thereof, in substantially equal monthly or more frequent installments, an annual base salary of not less than $150,000 (the "Salary"). The Executive's Salary rate shall be reviewed by the Board each year during the Agreement Term, while the Executive is employed by the Company, to determine whether an increase in the amount of Salary is appropriate. Any such increase in the amount of Salary shall be subject to approval by the Board. In no event shall the Salary of the Executive be reduced to an amount that is less than the amount specified in this paragraph (a), or to an amount that is less than the amount that the Executive was previously receiving.

(b)　In respect of each calendar year during the Agreement Term, the Executive shall be entitled to receive an annual bonus if the Executive achieves target or better objective performance goals. The maximum amount of such bonus shall be 100% of the Executive's Salary, and such bonus shall not be less than 50% of the Executive's Salary if the target goals for the calendar year are achieved. The performance goals shall be established by the Board or a committee thereof.

Annual bonus amounts shall be paid on or before the end of the calendar year subsequent to the calendar year for which the bonus applies.

(c)     On the Employment Commencement Date, the Executive shall be granted an option to purchase 8% of the total shares of common stock of the Company issued and outstanding as of the Employment Commencement Date (the "Option"). One-fourth of the Option shall be fully vested and immediately exercisable on the date of the grant.  Subject to the Executive's continued employment, an additional one-fourth of the Option shall vest and become exercisable on each of the first, second and third anniversaries of the Employment Commencement Date, such that the Option shall be 100% vested on the third anniversary of the Employment Commencement Date.  The Option shall have an exercise price equal to the fair market value of a share of the Company's common stock on the date of grant.  As a condition to exercise of the Option, the Executive shall agree to execute a counterpart to that certain Stockholders Agreement by and among the Company and the other parties listed on the signature pages thereto (the "Stockholders Agreement"), and to be bound by the terms and conditions contained therein.  The terms of the Option shall be set forth in a separate agreement between the parties and shall be consistent with the terms of this Agreement and the Stockholders Agreement.

(d)     The Executive shall be entitled to health insurance benefits (including medical, prescription drug, dental and vision coverage), long-term disability coverage and life insurance coverage at the Company's sole expense.  The amount of such health insurance coverage shall be that provided under the welfare benefit plans, policies or programs maintained by the Company from time to time for its employees generally, without regard to any employee cost-sharing requirements under such plans, policies or programs.  The amount of such life insurance coverage shall be $1,000,000, and the amount of such long-term disability coverage shall be 50% of Salary payable until the Executive reaches age 65.  The Executive shall complete all forms and physical examinations, and otherwise take all other similar actions to secure coverage and benefits described in this paragraph 2(d), to the extent determined to be necessary or appropriate by the Company.

(e)     The Executive shall be entitled to the same vacation and other welfare and fringe benefits (other than those described in paragraph 2(d)) as are provided to other employees of the Company in accordance with the applicable plans, policies or programs in effect from time to time.

(f)     The Executive shall be entitled to participate on the same basis as other employees of the Company in all incentive, retirement, and other similar benefit plans, policies or programs maintained by the Company from time to time for the benefit of Company employees generally.

(g)    The Executive shall be entitled to receive prompt reimbursement for expenses incurred by the Executive in performing his duties and responsibilities hereunder in accordance with the Company's policy regarding such reimbursements.

(h)    All payments and benefits to the Executive under this Agreement shall be subject to reduction for payroll and other applicable taxes.

3.    <u>Termination</u>. The Executive's employment with the Company during the Agreement Term may be terminated by the Company or the Executive without any breach of this Agreement only under the circumstances described in paragraphs 3(a) through 3(f):

(a)    <u>Death</u>. The Executive's employment hereunder will terminate upon death.

(b)    <u>Permanent Disability</u>. The Company may terminate the Executive's employment during any period in which the Executive is unable to render services hereunder by reason of a Permanent Disability. For purposes of this Agreement, the term "Permanent Disability" means a physical or mental condition of the Executive which, as determined by a licensed practicing physician mutually acceptable to the Company and the Executive, is expected to continue indefinitely and which, after reasonable accommodation, renders the Executive incapable of performing a substantial portion of the services contemplated hereunder. The Executive agrees to submit to such tests and examination as such physician shall deem appropriate.

(c)    <u>Cause</u>. The Company may terminate the Executive's employment hereunder at any time for Cause. For purposes of this Agreement, the term "Cause" shall mean:

    (i)    The willful and continued failure by the Executive to perform his duties for the Company, which is not corrected within a reasonable time after a written demand for performance is delivered to the Executive by the Board, which demand specifically identifies the manner in which the Board believes that the Executive has not performed his duties;

    (ii)    The willful engaging by the Executive in conduct which results in demonstrable and material injury to the Company;

    (iii)    The engaging by the Executive in criminal conduct which results in a conviction or a plea to a felony charge involving moral turpitude; or

    (iv)    Any material breach of this Agreement by the Executive not described in paragraphs (i) through (iii) above.

For purposes of this Agreement, no act, or failure to act, on the Executive's part shall be deemed "willful" unless done, or omitted to be done, by the Executive not in good faith

and without reasonable belief that the Executive's action or omission was in the best interest of the Company.

(d)   Constructive Discharge.  If (I) the Executive provides written notice to the Company of the occurrence of Good Reason (as defined below) within 60 days after the Executive has knowledge of the circumstances constituting Good Reason, which notice shall specifically identify the circumstances which the Executive believes constitute Good Reason; (II) the Company fails to notify the Executive of the Company's intended method of correction within a reasonable time after the Company receives the notice, or the Company fails to correct the circumstances within a reasonable time after receipt of such notice; and (III) the Executive resigns within a reasonable time after receiving the Company's response, if such notice does not indicate an intention to correct such circumstances, or within a reasonable time after the Company fails to correct such circumstances; then the Executive shall be considered to have been subject to a Constructive Discharge by the Company.  For purposes of this Agreement, "Good Reason" shall mean, without the Executive's express written consent (and except as the result of a prior termination of the Executive's employment), the occurrence of any of the following circumstances:

(i)     The assignment to the Executive of any duties inconsistent with the provisions of paragraph 1.

(ii)    A reduction by the Company in the Executive's Salary to an amount that is less than required under paragraph 2(a).

(iii)   The relocation of the Executive's main office to an office that is more than 50 miles away from the current location.

(iv)   The failure of the Company to obtain a satisfactory agreement from any successor to assume and agree to perform this Agreement.

(v)    Any purported termination of the Executive's employment which is not effected pursuant to a Notice of Termination satisfying the requirements of paragraph (g) below, and for purposes of this Agreement, no such purported termination shall be effective.

(vi)   Any material breach of this Agreement by the Company not described in paragraphs (i) through (v) above.

The Executive's right to terminate employment pursuant to this paragraph (d) shall not be affected by incapacity due to physical or mental illness.  The Executive's continued employment shall not constitute consent to, or a waiver of rights with respect to, any circumstance constituting Good Reason hereunder.

(e)    <u>Termination by Executive</u>.  The Executive may terminate employment hereunder at any time for any reason by giving the Company prior written Notice of Termination, which Notice of Termination shall be effective not less than 90 days after it is given to the Company, provided that nothing in this Agreement shall require the Executive to specify a reason for any such termination.  However, to the extent that the procedures specified in paragraph 3(d) are required, the procedures of this paragraph 3(e) may not be used in lieu of the procedures required under paragraph 3(d).

(f)    <u>Termination by Company</u>.  The Company may terminate the Executive's employment hereunder at any time for any reason, by giving the Executive prior written Notice of Termination, which Notice of Termination shall be effective not less than 60 days after it is given.  The Company shall not be required to specify a reason for the termination under this paragraph 3(f), provided that termination of the Executive's employment by the Company shall be deemed to have occurred under this paragraph 3(f) only if it is not for reasons described in paragraph 3(b), 3(c), 3(d), or 3(e).  Notwithstanding the foregoing provisions of this paragraph (f), if the Executive's employment is terminated by the Company in accordance with this paragraph (f), and within a reasonable time period thereafter, it is determined by the Board that circumstances existed which would have constituted a basis for termination of the Executive's employment for Cause in accordance with paragraph 3(c), the Executive's employment will be deemed to have been terminated for Cause in accordance with paragraph 3(c) (provided, however, that termination for Cause shall not be determined to exist under this sentence by reason of circumstances which could have been remedied if notice had been given in accordance with paragraph 3(c)(i)).

(g)    <u>Notice of Termination</u>.  Any termination of the Executive's employment by the Company or the Executive (other than a termination pursuant to paragraph 3(a)) must be communicated by a written Notice of Termination to the other party hereto.  For purposes of this Agreement, a "Notice of Termination" means a dated notice which indicates the Date of Termination (not earlier than the date on which the notice is provided), and which indicates the specific termination provision in this Agreement relied on and which sets forth in reasonable detail the facts and circumstances, if any, claimed to provide a basis for termination of the Executive's employment under the provision so indicated.

(h)    <u>Date of Termination</u>.  "Date of Termination" means the last day the Executive is employed by the Company, provided that the Executive's employment is terminated in accordance with the foregoing provisions of this paragraph 3.

(i)    <u>Effect of Termination</u>.  If, on the Date of Termination, the Executive is a member of the Board of the Company or a member of the Board of Directors of any of the

Subsidiaries, or holds any other position with the Company and the Subsidiaries, the Executive shall resign from all such positions as of the Date of Termination.

4.    <u>Rights Upon Termination</u>.  The Executive's right to payment and benefits under this Agreement for periods after the Date of Termination shall be determined in accordance with the following provisions of this paragraph 4:

(a)    If the Executive's Date of Termination occurs during the Agreement Term for any reason the Company shall pay to the Executive:

    (i)    The Executive's Salary for the period ending on the Executive's Date of Termination.

    (ii)    Payment for accrued vacation days, as determined in accordance with Company policy as in effect from time to time.

    (iii)    If the Date of Termination occurs after the end of a performance period, and prior to payment of the performance bonus for the period, the Executive shall be paid any bonus amount earned for the performance period at the regularly scheduled time.

    (iv)    Any other payments or benefits to be provided to the Executive by the Company pursuant to any employee benefit plans or arrangements adopted by the Company, to the extent such amounts are due from the Company.

Except as otherwise provided by law or expressly provided to the contrary in this Agreement, nothing in this Agreement shall be construed as requiring the Executive to be treated as employed by the Company for purposes of any employee benefit plan or arrangement following the date of the Executive's Date of Termination.

(b)    If the Executive's Date of Termination occurs during the Agreement Term under circumstances described in paragraph 3(c) (relating to the Executive's termination for Cause) or paragraph 3(e) (relating to the Executive's resignation), or if the Executive's employment with the Company terminates after the end of the Agreement Term then, except as otherwise expressly provided in this Agreement or otherwise agreed in writing between the Executive and the Company, the Company shall have no obligation to make payments under the Agreement for periods after the Executive's Date of Termination.

(c)    If the Executive's Date of Termination occurs during the Agreement Term under circumstances described in paragraph 3(a) (relating to Executive's death) or paragraph 3(b) (relating to Executive's Permanent Disability), then, in addition to the amounts payable in accordance with paragraph 4(a), the Executive shall receive payment of the bonus for the performance period in which the Date of Termination occurs, based on actual performance for the entire period, and

payable at the time provided in paragraph 2(b) hereof; provided, however, that it shall be subject to a pro-rata reduction for the portion of the performance period following the Date of Termination.

(d)     If the Executive's Date of Termination occurs during the Agreement Term under circumstances described in paragraph 3(d) (relating to Constructive Discharge) or paragraph 3(f) (relating to termination by the Company without Cause), then, in addition to the amounts payable in accordance with paragraph 4(a):

(i)     The Executive shall receive from the Company for the duration of the Severance Period (as defined below), the Salary amount described in paragraph 2(a), as in effect on the Date of Termination, payable in monthly installments on the first day of each month during the Severance Period. For purposes of this Agreement, the "Severance Period" is the longer of (I) the time remaining in the Initial Term on the Date of Termination or (II) one year after the Date of Termination. Payment of any amounts under this paragraph (i) shall cease with respect to periods after the earlier to occur of the date of the Executive's death, or a date, if any, of the breach by the Executive of the provisions of paragraph 7, paragraph 8, or paragraph 9.

(ii)    The Executive shall receive for the duration of the Severance Period, continuation of his health insurance coverage in effect on the Date of Termination at the Company's sole expense, and following the expiration of the Severance Period, COBRA continuation coverage under the Company's health insurance plan for 18 months at the Executive's sole expense; provided, however, that, except as otherwise required by applicable law, the Executive shall not be entitled to any continued health insurance coverage under this paragraph (ii) for any period during which he is enrolled in another group health plan. Company-paid benefits under this paragraph (ii) shall cease with respect to periods after a date, if any, of the breach by the Executive of the provisions of paragraph 7, paragraph 8, or paragraph 9.

(iii)   The Executive shall receive payment of the bonus for the performance period in which the Date of Termination occurs, based on actual performance for the entire period, and payable at the time provided in paragraph 2(b) hereof; provided, however, that it shall be subject to a pro-rata reduction for the portion of the performance period following the Date of Termination.

(iv)    As of the Date of Termination, and notwithstanding any provision of a stock option or other equity compensation plan or agreement to the contrary, the Executive (i) shall be fully vested in any stock option or other equity compensation awards held by the Executive as of the Date of

Termination and (ii) with respect to any stock option award, shall be entitled to a post-termination exercise period of at least 90 days following the Date of Termination.

In no event, however, shall the Executive be entitled to receive any amounts, rights, or benefits under this paragraph (d) unless the Executive executes a release of claims against the Company substantially in the form attached hereto as Exhibit A.

(e)     Except as may be otherwise specifically provided in an amendment of this paragraph (e) adopted in accordance with paragraph 13, the Executive's rights under this paragraph 4 shall reduce any benefits that may be otherwise payable to or on behalf of the Executive pursuant to the terms of any severance pay arrangement of the Company or any Subsidiary or any other, similar arrangement of the Company or any Subsidiary providing benefits upon involuntary termination of employment.

5.     <u>Duties on Termination</u>.  Subject to the terms and conditions of this Agreement, during the period beginning on the date of delivery of a Notice of Termination, and ending on the Date of Termination, the Executive shall continue to perform his duties as set forth in this Agreement, and shall also perform such services for the Company as are necessary and appropriate for a smooth transition to the Executive's successor, if any.  Notwithstanding the foregoing provisions of this paragraph 5, the Company may suspend the Executive from performing his duties under this Agreement following the delivery of a Notice of Termination providing for the Executive's resignation, or delivery by the Company of a Notice of Termination providing for the Executive's termination of employment for any reason; provided, however, that during the period of suspension (which shall end on the Date of Termination), the Executive shall continue to be treated as employed by the Company for other purposes, and his rights to compensation or benefits shall not be reduced by reason of the suspension.

6.     <u>Mitigation and Set-Off</u>.  The Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise.  The Company shall be entitled to set off against amounts payable to the Executive any amounts owed to the Company by the Executive, but the Company shall not be entitled to set off against the amounts payable to the Executive under this Agreement any amounts earned by the Executive in other employment after termination of employment with the Company, or any amounts which might have been earned by the Executive in other employment had such other employment been sought.

7.     <u>Noncompetition</u>

(a)     While the Executive is employed by the Company, and for the duration of the Severance Period set forth in paragraph 4(d) hereof after termination of the Executive's employment with the Company for any reason during the Agreement Term:

(i)     The Executive shall not, without the express written consent of the Board, be employed by, serve as a consultant to, or otherwise assist or directly or indirectly provide services to a Competitor (defined below) if: (A) such services are to be provided with respect to any location in which the Company or a Subsidiary did business during the 12-month period prior to the Date of Termination, or with respect to any location in which the Company or a Subsidiary had devoted material resources to doing business during the 12-month period prior to the Date of Termination; or (B) the trade secrets, confidential information, or proprietary information (including, without limitation, confidential or proprietary methods) of the Company and the Subsidiaries to which the Executive had access could reasonably be expected to benefit the Competitor if the Competitor were to obtain access to such secrets or information.

(ii)    The Executive shall not, without the express written consent of the Board, solicit or attempt to solicit any party who is then or, during the 12-month period prior to such solicitation or attempt by the Executive was (or was solicited to become), a customer or supplier of the Company or a Subsidiary, or a user of the services provided by the Company or a Subsidiary, provided that the restriction in this paragraph (ii) shall not apply to any activity on behalf of a business that is not a Competitor.

(iii)   The Executive shall not, without the express written consent of the Board, directly or indirectly own an equity interest in any Competitor (other than ownership of 5% or less of the outstanding stock of any corporation listed on a national stock exchange or included in the NASDAQ System).

(b)     While the Executive is employed by the Company, and for the duration of the Severance Period set forth in paragraph 4(d) hereof after termination of the Executive's employment with the Company for any reason during the Agreement Term, the Executive shall not, without the express written consent of the Board, solicit, entice, persuade or induce any individual who is employed by the Company or any Subsidiary (or was so employed within 90 days prior to the Executive's action) to terminate or refrain from renewing or extending such employment or to become employed by or enter into contractual relations with any other individual or entity other than the Company or any Subsidiary, and the Executive shall not approach any such employee for any such purpose or authorize or knowingly cooperate with the taking of any such actions by any other individual or entity.

(c)     The term "Competitor" means any enterprise (including a person, firm or business, whether or not incorporated) during any period in which it is materially competitive in any way with any business in which the Company or any of the

Subsidiaries was engaged during the 12-month period prior to the Executive's Date of Termination.

Nothing in this paragraph 7, paragraph 8, or paragraph 9 shall be construed as limiting the Executive's duty of loyalty to the Company, or any other duty otherwise owed to the Company, while the Executive is employed by the Company.

8.    Non-Disparagement.  The Executive agrees that he shall not make any false, defamatory or disparaging statements about the Company, the Subsidiaries, or the officers or directors of the Company or the Subsidiaries that are reasonably likely to cause material damage to the Company, the Subsidiaries, or the officers or directors of the Company or the Subsidiaries. The Company agrees, on behalf of itself and the Subsidiaries, that neither the officers nor the directors of the Company or the Subsidiaries shall make any false, defamatory or disparaging statements about the Executive that are reasonably likely to cause material damage to the Executive.

9.    Confidential Information.  The Executive agrees that, during the Agreement Term, and at all times thereafter:

(a)    The Executive agrees to keep secret all Confidential Information and Intellectual Property which may be obtained during the period of employment by the Company and that the Executive shall not reveal or disclose it, directly or indirectly, except with the Company's prior written consent.  The Executive shall not make use of the Confidential Information or Intellectual Property for the Executive's own purposes or for the benefit of anyone other than the Company and shall protect it against disclosure, misuse, espionage, loss and theft.

(b)    The Executive acknowledges and agrees that all Intellectual Property is and shall be owned by the Company.  The Executive hereby assigns and shall assign to the Company all ownership rights possessed in any Intellectual Property contributed, conceived or made by the Executive (whether alone or jointly with others) while employed by the Company, whether or not during work hours.  The Executive shall promptly and fully disclose to the Company in writing all such Intellectual Property after such contribution, conception or other development.  The Executive agrees to fully cooperate with the Company, at its expense, in securing, enforcing and otherwise protecting throughout the world the Company's interests in such Intellectual Property, including, without limitation, by signing all documents reasonably requested by the Company.

(c)    Immediately following the Date of Termination, the Executive agrees to promptly deliver to the Company all memoranda, notes, manuals, lab notebooks, computer diskettes, passwords, encryption keys, electronic mail and other written or electronic records (and all copies thereof) constituting or relating to Confidential Information or Intellectual Property that the Executive may then possess or have

control over.  If the Company requests, the Executive shall provide written certification that all such materials have been returned.

(d)    For purposes of this Agreement, the following terms shall be defined as set forth below:

(i)    "Confidential Information" shall mean all information, in any form or medium, that relates to the business, marketing, costs, prices, products, processes, services, methods, computer programs and systems, personnel, customers, research or development of the Company and the Subsidiaries and all other information related to the Company and the Subsidiaries which is not readily available to the public.

(ii)    "Intellectual Property" shall mean, with respect to the following which are created or existing during the period of the Executive's employment by the Company, any: (A) idea, know-how, invention, discovery, design, development, software, device, technique, method or process (whether or not patentable or reduced to practice or including Confidential Information) and related patents and patent applications and reissues, re-examinations, renewals, continuations-in-part, continuations, and divisions thereof; (B) copyrightable and mask work (whether or not including Confidential Information) and related registrations and applications for registration; (C) trademarks, trade secrets and other proprietary rights; and (D) improvements, updates and modifications of the foregoing made from time to time.

10.    <u>Assistance with Claims</u>.  The Executive agrees that, for the period beginning on the Employment Commencement Date, and continuing for a reasonable period after the Executive's Date of Termination, the Executive will assist the Company and the Subsidiaries in defense of any claims that may be made against the Company and the Subsidiaries, and will assist the Company and the Subsidiaries in the prosecution of any claims that may be made by the Company or the Subsidiaries, to the extent that such assistance is reasonably feasible and such claims relate to services performed by the Executive for the Company and the Subsidiaries. The Executive agrees to promptly inform the Company upon becoming aware of any lawsuits involving such claims that may be filed against the Company or any Subsidiary.  The Company agrees to provide legal counsel to the Executive in connection with such assistance (to the extent legally permitted), and to reimburse the Executive for all of the Executive's reasonable out-of-pocket expenses associated with such assistance, including travel expenses.  For periods after the Executive's employment with the Company terminates, the Company agrees to provide reasonable compensation to the Executive for such assistance.  To the extent that it is legally permitted, the Executive also agrees to promptly inform the Company upon being asked to assist in any investigation of the Company or the Subsidiaries (or their actions) that may relate to services performed by the Executive for the Company or the Subsidiaries, regardless of whether

a lawsuit has then been filed against the Company or the Subsidiaries with respect to such investigation.

11.    <u>Equitable Remedies</u>. The Executive acknowledges that the Company would be irreparably injured by a violation of paragraph 7, paragraph 8 or paragraph 9, and therefore, agrees that the Company, in addition to any other remedies available to it for such breach or threatened breach, shall be entitled to a preliminary injunction, temporary restraining order, or other equivalent relief, restraining the Executive from any actual or threatened breach of paragraph 7, paragraph 8, or paragraph 9. The Company acknowledges that the Executive would be irreparably injured by a violation of paragraph 8, and the Company agrees that the Executive, in addition to any other remedies available to the Executive for such breach or threatened breach, shall be entitled to a preliminary injunction, temporary restraining order, or other equivalent relief, restraining the Company from any actual or threatened breach of paragraph 8. If a bond is required to be posted in order for the Company or the Executive to secure an injunction or other equitable remedy, the parties agree that said bond need not be more than a nominal sum.

12.    <u>Nonalienation</u>. The interests of the Executive under this Agreement are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, or garnishment by creditors of the Executive or the Executive's beneficiary.

13.    <u>Amendment</u>. This Agreement may be amended or cancelled only by mutual agreement of the parties in writing without the consent of any other person. So long as the Executive lives, no person, other than the parties hereto, shall have any rights under or interest in this Agreement or the subject matter hereof.

14.    <u>Code Section 409A Compliance</u>. The parties acknowledge that certain payments hereunder may constitute "non-qualified deferred compensation," as defined in Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder ("Section 409A"), and it is intended that such payments will comply with the requirements of Section 409A. Accordingly, the Company and the Executive agree to use their best efforts to effect such compliance, including, to the extent necessary, amending this Agreement.

15.    <u>Applicable Law</u>. The provisions of this Agreement shall be construed in accordance with the laws of the State of New York, without regard to the conflict of law provisions of any state.

16.    <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, and this Agreement will be construed as if such invalid or unenforceable provision were omitted (but only to the extent that such provision cannot be appropriately reformed or modified).

17.    <u>Waiver of Breach</u>. No waiver by any party hereto of a breach of any provision of this Agreement by any other party, or of compliance with any condition or provision of this Agreement to be performed by such other party, will operate or be construed as a waiver of any

subsequent breach by such other party of any similar or dissimilar provisions and conditions at the same or any prior or subsequent time. The failure of any party hereto to take any action by reason of such breach will not deprive such party of the right to take action at any time while such breach continues.

18.    Successors. This Agreement shall be binding upon, and inure to the benefit of, the Company and its successors and assigns and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business, and the successor shall be substituted for the Company under this Agreement.

19.    Notices. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, or sent electronically or by facsimile or prepaid overnight courier to the parties at the addresses set forth below (or such other addresses as shall be specified by the parties by like notice). Such notices, demands, claims and other communications shall be deemed given:

(a)    in the case of delivery by overnight service with guaranteed next day delivery, the next day or the day designated for delivery;

(b)    in the case of certified or registered U.S. mail, five days after deposit in the U.S. mail; or

(c)    in the case of email or facsimile, the date upon which the transmitting party received confirmation of receipt by email, facsimile, telephone or otherwise;

provided, however, that in no event shall any such communications be deemed to be given later than the date they are actually received. Communications that are to be delivered by the U.S. mail or by overnight service or two-day delivery service are to be delivered to the addresses set forth below:

to the Company:

at the address of the offices of Murphy & Partners, L.P. in New York, NY,

or to the Executive:

at address in the Company's records.

All notices to the Company shall be directed to the attention of the John J. Murphy, Jr. Each party, by written notice furnished to the other party, may modify the applicable delivery address, except that notice of change of address shall be effective only upon receipt.

20.    <u>Survival of Agreement</u>.  Except as otherwise expressly provided in this Agreement, the rights and obligations of the parties to this Agreement shall survive the termination of the Executive's employment with the Company.

21.    <u>Entire Agreement</u>.  Except as otherwise indicated herein, this Agreement, including any Exhibit(s) attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior and contemporaneous agreements, if any, between the parties relating to the subject matter hereof; provided, however, that nothing in this Agreement shall be construed to limit any policy or agreement that is otherwise applicable relating to confidentiality, rights to inventions, copyrightable material, business and/or technical information, trade secrets, solicitation of employees, interference with relationships with other businesses, competition, and other similar policies or agreement for the protection of the business and operations of the Company and the Subsidiaries.

IN WITNESS THEREOF, the Executive has hereunto set his hand, and the Company has caused these presents to be executed in its name and on its behalf, all as of the Effective Date.

Philip Giordano

N B Education, Inc.

By: _____

Its: _____ CHAIRMAN

The Executive further represents and warrants that he has not filed, and will not initiate, or cause to be initiated on his behalf any complaint, charge, claim, or proceeding against any of the Released Parties before any federal, state, or local agency, court, or other body relating to any claims barred or released in this General Release thereof, and will not voluntarily participate in such a proceeding. However, nothing in this General Release shall preclude or prevent the Executive from filing a claim, which challenges the validity of this General Release solely with respect to the Executive's waiver of any Claims arising under the ADEA. The Executive shall not accept any relief obtained on his behalf by any government agency, private party, class, or otherwise with respect to any claims covered by this General Release.

The Executive may take 21 days to consider whether to execute this General Release. Upon the Executive's execution of this General Release, the Executive will have seven days after such execution in which he may revoke such execution. In the event of revocation, the Executive must present written notice of such revocation to the Company's Board of Directors. If seven days pass without receipt of such notice of revocation, this General Release shall become binding and effective on the eighth day after the execution hereof (the "Effective Date").

INTENDING TO BE LEGALLY BOUND, I hereby set my hand below:

_____

Philip Giordano

Dated:_____

## NOTARIZATION

State of _____    )
County of _____    )         ss.

On this _____ day of _____ in the year 200_ before me, the undersigned, personally appeared _____; personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his capacity as an individual, and that by his signature on the instrument he executed such instrument, and that such individual made such appearance before the undersigned.

_____
Notary Public

- 2 -

**EXHIBIT  B**

# NB EDUCATION LLC

<u>VIA FACSIMILE & OVERNIGHT COURIER</u>

Mr. Philip J. Giordano                                    April 30, 2008
NB Education LLC
45 Rockefeller Plaza
Suite 1960
New York, NY 10111

Re:  Employment Agreement

Dear Phil:

On behalf of the Board of Managers of NB Education, LLC ("NBE"), I am writing to notify you that you are being terminated, effective immediately upon your receipt of this letter (the "Termination Date"), from your position as President and Chief Executive Officer of NBE. The reason for your termination is the breach of Section 1(b) of your Employment Agreement with NBE, dated February 17, 2006 (the "Agreement"), which requires you to devote your "full time, energies and talents" to serving in those positions. Contrary to this obligation, by your own admission during our meeting in Hampton on April 11, 2008 you have been spending only fifty to sixty percent of your professional time on NBE business. As a consequence of your ongoing breach, the Company has consistently under-performed, resulting in a significant deterioration in Members' value. Accordingly, your termination is for cause, pursuant to Section 3(c) (iv) of the Agreement.

Under the terms of the Agreement, you are entitled to (i) your salary earned through the Termination Date and (ii) payment for accrued vacation days.

Please return any and all originals and copies of NBE documents, books and records (whether in written, electronic, computerized, graphic, photographic, or other form) and equipment and other property to NBE, c/o Timothy J. Durkin, immediately.

Please be mindful that you continue to be bound by, and NBE will hold you responsible for compliance with all of your obligations including, but not limited to, the non-competition, non-disparagement and confidentiality obligations set forth in the Agreement.

Thank you.

                                        Very truly yours,
                                        Board of Managers of NB Education, LLC,

                                        By: